CABALLERO LAW LLLC

MATEO CABALLERO               10081
P.O. Box 235052
Honolulu, Hawaiʻi 96823
Telephone:  (808) 600-4749
E-mail:       mateo@caballero.law

ACLU OF HAWAII FOUNDATION

JONGWOOK "WOOKIE" KIM        11020
P.O. Box 3410
Honolulu, Hawaiʻi 96801
Telephone:  (808) 522-5905
E-mail:       wkim@acluhawaii.org

Attorneys for Plaintiffs
TAMARA TAYLOR, individually, and
on behalf of her minor child, N.B.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| TAMARA TAYLOR, individually and on behalf of her minor child, N.B., <br><br> Plaintiffs, <br><br> vs. <br><br> CITY AND COUNTY OF HONOLULU; HAWAII STATE DEPARTMENT OF EDUCATION; C. NEVES, in an individual capacity; C. PEREZ, in an individual capacity; FORD, in an individual capacity; TERRI RUNGE, in an individual capacity; HPD DEFENDANTS 1-10; and DOE-HI DEFENDANTS 1-10 <br><br> Defendants. | CIV. NO. 22-13 <br><br> [CIVIL RIGHTS ACTION] <br><br> **COMPLAINT; DEMAND FOR JURY TRIAL** |

Plaintiffs, TAMARA TAYLOR, individually and on behalf of her minor child, N.B., by and through their undersigned attorneys, bring this Complaint against the above-named Defendants, and in support thereof allege the following:

## PRELIMINARY STATEMENT

1.     This is an action for damages and for declaratory and injunctive relief to remedy Defendants' violations of Plaintiffs' rights under the Fourth and Fourteenth Amendments to the U.S. Constitution, Title VI of the Civil Rights Act of 1964, Title II of the Americans with Disabilities Act ("*ADA*"), Section 504 of the Rehabilitation Act, and Hawai'i tort law.

2.     Plaintiff N.B. is a twelve-year old Black girl with a disability who was handcuffed and arrested by Honolulu Police Department ("*HPD*") officers on January 10, 2020, when she was only ten years old and while she was attending Honowai Elementary School ("*Honowai*").

3.     The day prior to her arrest, N.B. had made an offensive drawing together with other classmates, following an incident in which she was bullied by a third child. N.B. often draws as a coping mechanism for her disability. When the offensive drawing was finished, N.B. did not want to give the picture to that child, but one of the other classmates involved in making the drawing later delivered it against N.B.'s wishes.

4.     That same day the drawing was brought to the school's attention.

5.     The next morning around 7:40 a.m., the parent of yet another child went to Honowai upset about the drawing and insisted that the school call the police, which Defendant Terri Runge, the school vice principal, did.

6.     The responding HPD officers spent several hours in the school that morning. During that time, they interrogated N.B., and talked to the complaining parent, who wanted to press charges and have N.B. arrested. They also talked to Plaintiff Tamara Taylor, N.B.'s mother, who arrived at the school later that day.

7.     Neither the HPD officers, Defendant Runge, nor anyone else from the school questioned or investigated the other kids involved in the drawing.

8.     Around 11 a.m., N.B. commented to a school nurse that she wondered what spending one day in jail would be like. After the officers heard about the comment, they got upset and handcuffed and arrested N.B.

9.     At no time that morning was there an imminent danger to anyone in the school that justified the HPD officers handcuffing N.B., who had been calm and compliant.

10.    N.B.'s drawing was also a manifestation and coping mechanism of her disability and did not justify her arrest, particularly when she did not intend to give the drawing to anyone.

11.    Even though several other kids were involved in making the drawing, N.B. was the only student who was interrogated, handcuffed, and arrested. She was also the only Black student involved.

12.    Despite their knowledge of the need for more effective training, on interacting with and disciplining students with disabilities, upon information and belief, the DOE and HPD failed to provide effective additional training to officers and school staff on interacting with and disciplining students with disabilities.

13.    N.B. seeks injunctive relief expunging her arrest records for the incident. She further seeks an order declaring Defendants' conduct to be unconstitutional and to be in violation of Title VI of the Civil Rights Act of 1964, the ADA, and Section 504 of the Rehabilitation Act. Plaintiffs also seek compensatory damages and punitive damages for the physical injuries and trauma they suffered as result of Defendants' unconstitutional and illegal conduct, as well as reasonable attorneys' fees and costs.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Plaintiffs bring this action under 42 U.S.C. § 1983, Title VI of the Civil Rights Act of 1964, the ADA, and Section 504 of the Rehabilitation Act.

15.    Any state law claims contained herein form part of the same case or controversy as gives rise to Plaintiffs' federal law claims and therefore fall within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

16.    This Court may order declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

17.    Jurisdiction supporting Plaintiff's claims for attorney's fees and costs is conferred by 42 U.S.C. §§ 1988 and 12205.

18.    Venue is proper in the United States District Court for the District of Hawai'i pursuant to 28 U.S.C. § 1391(b), because Defendants are located in this district, and the events giving rise to Plaintiffs' claims occurred in this district.

**PARTIES**

19.    N.B. was only ten years old when she was handcuffed and arrested by HPD officers at Honowai Elementary School, where she was a fifth grade student. N.B. has a disability—attention deficit hyperactivity disorder ("*ADHD*")—and is a person with a disability under Title II of the ADA and Section 504 of the Rehabilitation Act. Plaintiff N.B. brings this action through her mother, Tamara Taylor.

20.    Plaintiff TAMARA TAYLOR ("*Ms. Taylor*") is N.B.'s mother and legal guardian and representative.

21.     Defendant CITY AND COUNTY OF HONOLULU ("*City*") is and has been a duly organized municipal corporation of the State of Hawaiʻi at all times pertinent hereto. Defendant City operates, manages, and controls the Honolulu Police Department. Defendant City is a public entity under Title II and a program or activity receiving federal financial assistance for purposes of Section 504 of the Rehabilitation Act and Title VI of the Civil Rights Act of 1964.

22.     Defendant HAWAII STATE DEPARTMENT OF EDUCATION ("*DOE*") is the state administrative agency that manages the statewide system of public schools, including Honowai Elementary School. Defendant DOE is a public entity under Title II and a program or activity receiving federal financial assistance for purposes of Section 504 of the Rehabilitation Act and Title VI of the Civil Rights Act of 1964.

23.     Defendant C. NEVES ("*Defendant Neves*") is and has been a citizen and resident of the City and County of Honolulu, State of Hawaiʻi, and has been employed as an HPD police officer at all times pertinent hereto.

24.      Defendant C. PEREZ ("*Defendant Perez*") is and has been a citizen and resident of the City and County of Honolulu, State of Hawaiʻi, and has been employed as an HPD police officer at all times pertinent hereto.

25.     Defendant FORD ("***Defendant Ford***") is and has been a citizen and resident of the City and County of Honolulu, State of Hawaiʻi, and has been employed as an HPD police officer at all times pertinent hereto.

26.     Defendant TERRI RUNGE ("***Defendant Runge***") is and has been a citizen and resident of the City and County of Honolulu, State of Hawaiʻi, and was employed as a vice principal by DOE at all times pertinent hereto.

27.     HPD DEFENDANTS 1-10 are individual officers and/or agents of HPD whose true identities and capacities are as yet unknown to Plaintiffs and their counsel, despite diligent inquiry and investigation, and who acted herein as described more particularly below in connection with the breaches of duties and/or violations of law alleged herein and who in some manner or form not currently discovered or known to Plaintiff may have contributed to or be responsible for the injuries alleged herein. The true names and capacities of HPD Defendants will be substituted as they become known.

28.     DOE-HI DEFENDANTS 1-10 are individual DOE staff and/or agents of DOE whose true identities and capacities are as yet unknown to Plaintiffs and their counsel, despite diligent inquiry and investigation, and who acted herein as described more particularly below in connection with the breaches of duties and/or violations of law alleged herein and who in some manner or form not currently discovered or known to Plaintiff may have contributed to or be responsible for the

injuries alleged herein. The true names and capacities of DOE-HI Defendants will

be substituted as they become known.

## FACTUAL ALLEGATIONS

**A.    Prior to the Incident, N.B., a Disabled Student With a Section 504 Plan, Was Being Bullied at School and Drew as a Coping Mechanism.**

29.    On January 10, 2020, N.B. was a ten-year-old girl and a fifth grade student

at Honowai Elementary School.

30.    At that time, N.B. had been diagnosed with ADHD, which makes it difficult

for her at times to pay and maintain attention. It also limits her in major life

activities, including learning, concentrating, and neurological/brain functions.

31.    In recognition of her diagnosis, on or around April 25, 2019, DOE prepared

a Section 504 plan with various accommodations for N.B., including the use of

"positive behavior management strategies."

32.    During her tenure at Honowai Elementary School, N.B. was often bullied by

her peers, including being called a "rag head."

33.    At the suggestion of mental health professionals and encouraged by her

family, N.B. has taken on drawing as a habit, creative-outlet, and as a way to cope

with her ADHD and bullying at school. For example, while she likes to make

drawings about super heroes and fantasy, in 2019, she drew a picture of several of

her classmates surrounding her and saying mean things to her at school. Defendant

Runge and other staff at Honowai Elementary School were aware of this last

drawing, which she made during an afterschool program. They were also aware of N.B.'s drawing habit in general as evidenced by her report cards often noting that she spent significant time drawing in class.

**B.  On January 9, 2020, N.B. and Three Other Classmates Drew a Picture Following a Bullying Incident, But N.B. Did Not Want to Give the Drawing to Anyone.**

34.    On January 9, 2020, in the morning during class, N.B. saw a boy and a girl named E. passing notes during class. Since the boy was the boyfriend of one of her friends, N.B. told this friend about the passing of notes.

35.    Later that morning, N.B. felt bad about telling on E. and wrote an apology letter to E. Later that day, E. poured ranch dressing on the apology letter and returned it to N.B.

36.    During lunch, N.B. with the assistance of three classmates drew a picture and wrote a message for E. While N.B. did most of the drawing, the other classmates made suggestions about its content, colored it, and wrote parts of the message.

37.    When it was finished, N.B. thought the drawing was a bad idea and she did not want to give it E.

38.    One of the other kids involved took the drawing and gave it to one of E.'s friends, K., later that day.

39.    K. then gave the drawing to a Honowai staff member that same day.

C.     **On January 10, 2021, the School Unnecessarily Called HPD Resulting in N.B. Being Unconstitutionally Handcuffed and Arrested.**

40.     On January 10, 2020, around 7:40 am, K.'s mother went to Honowai upset about the drawing that K. had received, met with Defendant Runge, and demanded that the school call the police.

41.     On or around 8:40 a.m., Defendant Runge called Ms. Taylor claiming that N.B. had slapped a student, wrote an apology letter to the student, and when the apology was not accepted, wrote another letter with a drawing, and passed the letter to another student to deliver the drawing. In fact, N.B. had neither slapped a student nor passed the drawing to another student to deliver it.

42.     Defendant Runge also told Ms. Taylor that she needed to come to the school because they were about to call the police at the request of K.'s mother because of the drawing incident. Ms. Taylor implored Defendant Runge not to do so, and said she would be on her way to the school shortly.

43.     Nevertheless, Defendant Runge called the police at the request of K.'s mother, who refused to leave Defendant Runge's office otherwise. Eventually, at least three officers arrived to the school, including Defendant Neves, Defendant Perez, and Defendant Ford (collectively, the "***Defendant HPD Officers***").

44.     Ms. Taylor, who was working at the time and could not leave work immediately, arrived to the school on or around 10:20 a.m.

10

45.    At the school, Ms. Taylor talked to Defendant Ford and Ms. Runge, both of whom intimated that K's parent was being unreasonable and was taking things out of proportion.

46.    Eventually, Ms. Taylor was informed that K.'s mother was going to press charges. Once again, Defendant Runge and some of the Defendant HPD Officers expressed disbelief at and lack of understanding about K.'s mothers actions.

47.    Ms. Taylor also expressed to Defendant Runge and the Defendant HPD Officers her concern about race playing a role in the situation, particularly given the police presence.

48.    Around this time, N.B., who had been secluded in an office and did not know her mom was at the school, stated that she felt cold and lonely. The school staff then moved her to the nurse's office.

49.    Unbeknownst to Ms. Taylor, N.B. had been interrogated without any Miranda warnings by the HPD officers and DOE staff about the drawing incident. One of the Defendant HPD Officers had also asked N.B. whether she had slapped E., which N.B. denied.

50.    Ms. Taylor attempted to leave the room but was prevented from doing so by a Honowai staff member. There was an armed police officer watching from a few feet away, so Ms. Taylor simply complied. After this, Ms. Taylor was escorted to another room to "stay and wait."

51.    While she was waiting at the nurse's office, around 11 a.m, N.B. mentioned to the nurse that she wondered what spending one day in jail would be like. Upon information and belief, the nurse relayed these comments to Defendant Runge and/or the Defendant HPD Officers, who became upset at the comments.

52.    Based on N.B.'s comments, Defendants Ford and Runge stated to Ms. Taylor that N.B. was treating the situation as a "joke," which they felt was very inappropriate.

53.    Ms. Taylor tried to exit the room again, but Defendant Ford blocked her way. She also requested to see her daughter and tried to explain N.B.'s comments to the HPD officers to no avail.

54.    Shortly after making the comments to the nurse, and without giving Ms. Taylor any notice or warning whatsoever, N.B. was put in handcuffs, arrested for terroristic threatening, and put in a police car to be driven away to the Pearl City Police Station. As she was being arrested, one of the Defendant HPD Officers commented to the other: "Oh, so she wanted to see what jail is like for a day."

55.    During her ride to the station, N.B. cried. The handcuffs, upon information and belief, made for adults, were on too tight and left marks when they took them off.

56.    When N.B. got to the Pearl City Police Station, officers asked her to take off her shoelaces and earrings, but she explained that she did not know how to,

because her mom normally did that for her. At the station, she was also asked if she knew why she was being arrested, to which she responded "no."

57.     Right after N.B.'s arrest, two officers asked Ms. Taylor to come outside the school and told her to follow them to the police station. In disbelief, Ms. Taylor then saw a police car driving out with her daughter. Shocked and distraught, Ms. Taylor started crying, loudly and full of anguish.

58.     While Ms. Taylor was still crying, Officer Ford confided to Ms. Taylor that they thought it was best for her not to see N.B. because they did not want Ms. Taylor to "beat [N.B.] at the school."

59.     Once she was calm enough to drive, Ms. Taylor followed the remaining officers to Pearl City Precinct, where HPD released N.B. to Ms. Taylor. N.B. was very hungry and exhausted. The handcuffs had also left marks on her wrists. She had been in the school or HPD's custody for over four hours.

**D.     Aftermath of the Incident.**

60.     Following the arrest, N.B. changed schools and eventually moved out of Hawaiʻi.

61.     No charges were filed against N.B. for the drawing incident.

62.     In the subsequent days after the arrest, Ms. Taylor had various conversations with Defendant Runge and Kent Matsumura, Honowai's Principal. When Ms. Taylor confronted Defendant Runge about being forced to stay in a room in

the school that day, Defendant Runge explained that they had to stop Ms. Taylor

because they saw "fire in her eyes."

63.    The school also did not ever investigate or discipline any of the other

classmates involved in the drawing incident.

64.    In another conversation with Defendant Runge, she explained to Ms. Taylor

that she had prevented Ms. Taylor from leaving the room that day because she was

concerned that Ms. Taylor would get arrested for intervening and attacking the

other parent or the police. Defendant Runge also agreed that the parent, not the

school, should have called the police, which Mr. Matsumura also confirmed.

65.    On May 7, 2020, Ms. Taylor filed a written complaint against the three

police officers who responded to Honowai Elementary on January 10, 2020, with

HPD's Professional Standards Office.

66.    On September 21, 2020, HPD's Professional Standards Office responded by

letter stating that they were not able to find sufficient evidence to sustain the

complaint.

67.    N.B. suffered physical injuries during the arrest, including on her wrists

from the handcuffs which were on too tight. N.B. and Ms. Taylor have also

suffered emotionally and since the incident, they have fear, distrust, and anxiety

when interacting with law enforcement officers. They both are also traumatized by

Honowai's failure to protect N.B. that day.

**E.     DOE and HPD's Deliberately Indifferent Policies and Procedures.**

68.     In 2009, the U.S. Government Accountability Office ("*GAO*") published the results of a nationwide study documenting hundreds of uses of restraints in schools between 1990 and 2009, including 20 restraints that resulted in the death of a child.[1] Nearly all of the incidents investigated by the GAO involved children with disabilities.

69.     That same year, in testimony before the U.S. House of Representatives Education and Labor Committee, the GAO presented these findings and reported on the risks of injury and death associated with the restraint of children. The GAO explained that even in situations where a child does not sustain any physical injury as a result of restraint, he is often severely traumatized.[2]

70.     In January 2019, the U.S. Department of Education announced an initiative on the inappropriate use of restraint and seclusion, and in July 2019, its agencies provided a presentation to educational agencies about how the use of restraint and seclusion may result in unlawful discrimination against students with disabilities

---

[1] Statement of Gregory D. Kutz, Managing Director of Forensic Audits and Special Investigations, U.S. Government Accountability Office, to Committee on Education and Labor, U.S. House of Representatives 8 (May 2009), at http://www.gao.gov/new.items/d09719t.pdf.
[2] *Id.* at 1.

and provided steps public schools must and can take to prevent the inappropriate use of restraint and seclusion on children with disabilities.[3]

71.     These national studies and presentations put DOE and HPD on notice that further training was necessary regarding putting children with disabilities in restraints and the risk of not providing this further training.

72.     Despite their knowledge of the need for more effective training and of the risks of failing to meet that need, upon information and belief, the DOE and HPD failed to provide effective additional training to officers and school staff on interacting with, restraining, and disciplining students with disabilities.

73.     Based on information and belief, the City has maintained and continues to maintain, with deliberate indifference, a policy and practice of imposing unnecessary mechanical restraints such as handcuffs on children in general and children with disabilities in particular, including N.B., upon arrest.

74.     HPD Policy No. 4.33 does not provide adequate and sufficient guidance to HPD officers about arresting, interrogating, restraining, and using handcuffs on children, including children with disabilities. While the policy requires officers to consider "disabling conditions and behavioral disabilities before determining whether a youth will be apprehended," it does not require HPD officers to inquire

---

[3] U.S. Department of Education Office of Civil Rights, Civil Rights Data Collection (CRDC): Technical Assistance on Restraint and Seclusion, https://www2.ed.gov/about/offices/list/ocr/data.html?src=image.

about such disabilities, and does not explain how a child's disability should be taken into consideration. Additionally, the policy of arresting all minors when the minor "is positively identified as a suspect in a documented crime, the complainant desires prosecution, and there is probable cause" discriminates and has a disparate impact on children with disabilities.

75.    According to the 2017 data reported to the U.S. Department of Education, 12.8 percent of students in Hawaiʻi public schools have a disability. Even so, public school students with disabilities represent 27.6 percent of all students who received out-of-school suspensions, 20.5 percent of school-related arrests, and 26.7 percent of students referred to law enforcement.

76.    Based on this data and upon information and belief, the DOE has maintained and continues to maintain, with deliberate indifference, a policy and practice of unnecessarily calling law enforcement for disciplinary and behavioral issues involving children in general and children with disabilities in particular, including N.B.

77.    Chapters 19 and 61 of Title 8 of the Hawaiʻi Administrative Rules do not provide adequate and sufficient guidance to DOE staff about referring disciplinary and behavioral issues to law enforcement for situations involving children in general and children with disabilities in particular. Specifically, neither chapters provide any guidance to DOE staff about requesting law enforcement assistance,

17

how to take into consideration a child's disability when calling law enforcement,

and informing law enforcement about a child's disability.

**FIRST CAUSE OF ACTION**
**False Arrest in Violation of the Fourth and Fourteenth Amendments to the**
**U.S. Constitution, 42 U.S.C. Section 1983, and State Tort Law**
**(Against Defendants Neves, Perez, and Ford, HPD Defendants,**
**and Defendant City and County of Honolulu)**

78.     Plaintiffs hereby incorporate all of the allegations contained in Paragraphs 1

through 77, above.

79.     N.B. brings this action pursuant to state tort law and 42 U.S.C. § 1983

alleging unreasonable seizure and false arrest in violation of the Fourth and

Fourteenth Amendments of the U.S. Constitution.

80.     Defendants Neves, Perez, and Ford and other HPD Defendants, acting under

color of state law, arrested N.B., or allowed her to be arrested, without a warrant

authorizing the seizure or a reasonable basis for believing that N.B. committed a

crime or offense that would permit N.B.'s arrest and/or detention.

81.     At the time N.B. was unlawfully arrested and imprisoned, she had a clearly

established constitutional rights under the Fourth Amendment to the U.S.

Constitution and Article I, Section 7 of the Hawaiʻi Constitution to be free from

unreasonable seizures.

82.    Defendants Neves, Perez, and Ford and other HPD Defendants acted knowingly, willfully, with malicious intent, and in reckless disregard for N.B.'s constitutional rights.

83.    The City is vicariously liable for N.B.'s false arrest under state tort law.

84.    As a proximate cause of the false arrest, N.B. suffered and/or continues to suffer emotional suffering, psychological and physical injuries, and trauma. N.B. continues to experience fear, distrust, and anxiety regarding law enforcement officers and attending school.

85.    N.B. is entitled to injunctive relief, declaratory relief, compensatory damages, punitive damages, and reasonable attorneys' fees and costs because of her false arrest.

### SECOND CAUSE OF ACTION
**Excessive Force in Violation of the Fourth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. Section 1983**
**(Against Defendants Neves, Perez, and Ford, and HPD Defendants)**

86.    Plaintiffs hereby incorporate all of the allegations contained in Paragraphs 1 through 77, above.

87.    N.B. brings this action pursuant to 42 U.S.C. § 1983 alleging unreasonable seizure and excessive force in violation of the Fourth and Fourteenth Amendments of the U.S. Constitution.

88.    Defendants Neves, Perez, and Ford and other HPD Defendants, acting under color of state law, used excessive force in violation of N.B.'s Fourth and

Fourteenth Amendments rights by handcuffing N.B., or allowing her to be handcuffed, when it was not necessary.

89.     Defendants Neves, Perez, and Ford and other HPD Defendants unreasonably and unconstitutionally seized N.B. and used excessive force in light of the totality of the circumstances, including but not limited to:

   a. that N.B. had not and was not engaging in criminal activity;

   b. that N.B. posed no physical threat to anyone;

   c. that N.B. was compliant, not resisting arrest, and not attempting to flee;

   d. N.B.'s age, size, and disability;

   e. the failure of the officers to appropriately interact with a child of N.B.'s age, size, and disability;

   f. the lack of necessity for handcuffing N.B.;

   g. the opportunity to release N.B. to the care of her mother; and

   h. the trauma imposed by the handcuffing.

90.     At the time excessive force was used against N.B., she had clearly established constitutional rights under the Fourth Amendment to the U.S. Constitution and Article I, Section 7 of the Hawai'i Constitution to be free from unreasonable seizures using excessive force.

91.     Defendants Neves, Perez, and Ford and other HPD Defendants acted knowingly, willfully, with malicious intent, and in reckless disregard for N.B.'s constitutional rights.

92.     As a proximate cause of the use of excessive force, N.B. suffered and continues to suffer emotional suffering, psychological injury, and trauma. N.B. continues to experience fear, distrust, and anxiety regarding law enforcement officers and attending school.

93.     N.B. is entitled to injunctive relief, declaratory relief, compensatory damages, punitive damages, and reasonable attorneys' fees and costs because of the use of excessive force against her.

### THIRD CAUSE OF ACTION
### *Monell* Liability for Use of Excessive Force in Violation of 42 U.S.C. § 1983
### (Against the City and County of Honolulu)

94.     Plaintiffs hereby incorporate all of the allegations contained in Paragraphs 1 through 77, above.

95.     At all times relevant hereto Defendant City and County of Honolulu and HPD were state actors acting under color of law.

96.     N.B.'s excessive force claim is cognizable under 42 U.S.C. § 1983.

97.     N.B. was deprived of her constitutional protected rights and privileges secured by the U.S. Constitution as set forth in this Complaint.

98.    These deprivations were cause by deliberately indifferent policies, customs, and established practices, including inadequate training, by the City and HPD, including but not limited to:

    a.  directing and/or ratifying humiliating, outrageous, discriminatory, and belittling actions toward children, including children with disabilities;

    b.  maintaining and implementing a custom, policy, and practice of imposing unnecessary mechanical restraints such as handcuffs on children, including children with disabilities;

    c.  failing to train and supervise adequately its officers, despite the foreseeable consequences of such failure, on appropriately interacting with children, including children with disabilities;

    d.  failing to train and supervise adequately its officers, despite the foreseeable consequences of such failure, on proper procedures and preparation regarding safely handcuffing children, including children with disabilities; and

    e.  failing and refusing to discipline its officers for engaging in humiliating, outrageous, discriminatory, and belittling actions.

99.    These directions, ratifications, customs, policies, practices, and/or failures to train and supervise were the moving force in the constitutional violations inflicted by Defendants Neves, Perez, and Ford and other HPD Defendants upon N.B.

100.   As a proximate cause of the unconstitutional acts of Defendants Neves, Perez, and Ford, HPD Defendants, and the City, N.B. suffered and continues to suffer emotional suffering, psychological injury, and trauma, and is entitled to injunctive relief, declaratory relief, compensatory damages, punitive damages, and reasonable attorneys' fees and costs.

## FOURTH CAUSE OF ACTION
### Discrimination on the Basis of Race in Violation of
### Title VI of the Civil Rights Act of 1964
### (Against the Department of Education and the City and County of Honolulu)

101.   Plaintiffs hereby incorporate all of the allegations contained in Paragraphs 1 through 77, above.

102.   Plaintiffs bring this action pursuant to Title VI of the Civil Rights of Act of 1964, which prohibits discrimination on the ground of race by recipients of federal funds.

103.   The City and DOE receive federal financial assistance.

104.   Plaintiffs are a Black mother and her Black child.

105.   Agents for the City and DOE discriminated against Plaintiffs on account of their race by treating them differently from how other non-Black students involved in the drawing and their parents were treated here.

106.   Evidence of such discrimination includes but is not limited to:

a. Defendant Runge calling the police on a disabled ten-year-old girl when there was no danger to anyone's safety and for an incident involving several

23

children, none of whom were interrogated and arrested and none of whom were Black either;

b.  Honowai school staff and HPD officers interrogated a disabled ten-year-old girl about alleged criminal activity without her parents present or Miranda warnings, in violation of Hawaiʻi Administrative Rules and her Fourteenth and Fifth Amendment rights;

c.  when Ms. Taylor arrived the administrators and police kept her away from her child and falsely imprisoned her based on prejudiced assumptions about "angry Black women,"[4] including that she would beat N.B., get into a fight with the other parent, or get arrested; and

---

[4] Trina Jones & Kimberly Jade Norwood, *Aggressive Encounters & White Fragility: Deconstructing the Trope of the Angry Black Woman*, 102 Iowa L. Rev. 2017, 2049 (2017) ("This so-called 'Angry Black Woman' is the physical embodiment of some of the worst negative stereotypes of Black women—she is out of control, disagreeable, overly aggressive, physically threatening, loud (even when she speaks softly), and to be feared. She will not stay in her 'place.'"); Sinikka Elliott and Megan Reid, *The Superstrong Black Mother*, 15 Contexts 48-53 (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4845037/ ("Racial bias can infuse even teachers' perceptions of Black mothers. A 2012 study by Susan Dumais and her colleagues found that elementary school teachers viewed Black parents' involvement in their children's schooling negatively, while interpreting White parents' involvement positively. Similarly, the Black mothers we spoke with whose children were involved with state institutions—including public schools and the criminal justice system—discussed the ways their mothering was assumed to be inadequate by institutional practices.").

    d.  HPD officers handcuffed a 10-year-old disabled girl in her school and took her to the station, not because she posed a danger to anyone or because she was not cooperating, but because they interpreted her nervous comment wondering what jail would be like as a sign that she was not taking the situation seriously and because she was perceived as a Black teenager, older than her actual age,[5] disrespecting the police.

107.  As a proximate cause of such discrimination, Plaintiffs suffered and continue to suffer emotional suffering, psychological injury, and trauma. Plaintiffs continue to experience fear, distrust, and anxiety regarding law enforcement officers and attending school.

---

[5] Rebecca Epstein, Jamilia J. Blake, & Thalia Gonzáles, Georgetown Law Center on Poverty and Inequality, *Girlhood Interrupted: The Erasure of Black Girls' Childhood* at 5 (2020), https://genderjusticeandopportunity.georgetown.edu/wp-content/uploads/2020/06/girlhood-interrupted.pdf ("These perceptions are consistent with viewing Black girls as older than their age. In the words of one teacher captured in a recent study by Professor Edward W. Morris, '[T]hey think they are adults too, and they try to act like they should have control sometimes.' Such comments demonstrate that stereotypes of Black girls, interpreted as 'loud,' are imbued with adult-like aspirations, and perceived, in turn, as a threat. The same study recorded teachers' describing Black girls as exhibiting 'very mature behavior socially (but not academically) sophisticated and controlling at a young age.' This interpretation of Black girls' outspokenness may be associated with the stereotype of Black women as aggressive and dominating. Differences in physical development based on the onset of puberty may also play a role in adultification, in light of evidence that 'on average, African American girls mature physically at a faster rate than [w]hite girls and as a result can be perceived as older.' (citations omitted)).

108.   Plaintiffs are entitled to injunctive relief, declaratory relief, compensatory damages, punitive damages, and reasonable attorneys' fees and costs because of the discrimination on the basis of their race.

## FIFTH CAUSE OF ACTION
### Disability-Based Discrimination in Violation of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act
### (Against the Department of Education and the City and County of Honolulu)

109.   Plaintiffs hereby incorporate all of the allegations contained in Paragraphs 1 through 77, above.

110.   N.B. brings this action pursuant to Title II of the ADA and Section 504 of the Rehabilitation Act, which forbid public entities, and programs and activities that receive federal assistance, from discriminating against individuals on the basis of disability.

111.   The City, HPD, and DOE receive federal financial assistance.

112.   The regulations implementing Title II of the ADA require that public entities avoid unnecessary policies, practices, criteria or methods of administration that have the effect or tendency of excluding or discriminating against persons with disabilities. 28 C.F.R. § 35.130(b)(3). Further, the regulations require that public entities provide reasonable modifications to their policies, practices, or procedures in order to avoid discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(7). Reasonable modifications include positive behavioral interventions and supports, redirection, de-escalation, crisis intervention, patience, and waiting.

113.   The regulations implementing Section 504 of the Rehabilitation Act require that entities receiving federal financial assistance avoid unnecessary policies, practices, criteria or methods of administration that have the effect of discriminating against persons with disabilities. 28 C.F.R. § 41.51(b)(3)(i).

114.   Under these provisions, law enforcement agencies and officers—including HPD officers—may not discriminate on the basis of disability, and must provide reasonable modifications as needed when interacting with persons with disabilities. Law enforcement agencies and officers should expect and anticipate that many of the children with whom they interact are children with disabilities, particularly in a school setting.

115.   Children with disabilities, and particularly children such as N.B., whose disabilities manifest as behavioral challenges, are disproportionately vulnerable to and injured by schools using law enforcement to deal with disciplinary matters and by the unnecessary use of restraints such as handcuffs on the basis of their disabilities. The effects on these children with disabilities include substantial and disproportionate physical and emotional injuries, and disruptive exclusions from educational programming.

116.   Based on information and belief, the City has maintained and continues to maintain, with deliberate indifference, a policy and practice of imposing unnecessary mechanical restraints such as handcuffs on children with disabilities,

including N.B. This policy and practice violates and continues to violate Title II of the ADA.

117.   Similarly, based on information and belief, the DOE has maintained and continues to maintain, with deliberate indifference, a policy and practice of unnecessarily calling law enforcement for disciplinary and behavioral issues involving children with disabilities, including N.B. This policy and practice violates and continues to violate Title II of the ADA and Section 504 of the Rehabilitation Act.

118.   Similarly, DOE failed to follow N.B.'s Section 504 requirement to use positive behavior management strategies in dealing with the drawing incident, which was a manifestation of N.B.'s disabilities. Such failure constitutes a violation of N.B.'s rights under Title II of the ADA and Section 504 of the Rehabilitation Act.

119.   Further, based on information and belief, the City and DOE have failed with deliberate indifference to implement the nondiscrimination and reasonable modification requirements of Title II of the ADA through adequate policies, practices, procedures, training, or supervision that take needs of children with disabilities into account, and instead authorized staff, such as Defendant Runge, and officers, such as Defendants Neves, Perez, and Ford, to discriminate against children with disabilities such as N.B. on the basis of disability.

120.   Through the City's and DOE's independent and joint failure with deliberate indifference to adopt an adequate policy and practice of providing reasonable modifications to children with disabilities, including N.B., such as positive behavioral interventions and supports, redirection, de-escalation, crisis intervention, patience, and waiting, the City and DOE have violated and continue to violate Title II of the ADA.

121.   As a proximate cause of such discrimination, N.B. suffered and continues to suffer emotional suffering, psychological injury, and trauma. N.B. continues to experience fear, distrust, and anxiety regarding law enforcement officers and school.

122.   N.B. is entitled to injunctive relief, declaratory relief, compensatory damages, punitive damages, and reasonable attorneys' fees and costs because of the discrimination on the basis of disability.

## SIXTH CAUSE OF ACTION
### Negligence and Negligent Infliction of Emotional Distress
### (Against Defendant Runge and DOE-HI Defendants)

123.   Plaintiffs hereby incorporate all of the allegations contained in Paragraphs 1 through 77, above.

124.   Defendant Runge and other DOE-HI Defendants owed Plaintiffs a duty to take such reasonable measures as would be taken by reasonable parents to avoid injury to N.B.

29

125.   Defendant Runge and other DOE-HI Defendants did not take reasonable measures as would be taken by reasonable parents to avoid injury to N.B. and thus, breached the duty owed to Plaintiffs.

126.   Defendant Runge and other DOE-HI Defendants breached the duty owed to N.B. by, among other things:

   a. calling the police on a disabled ten-year-old girl without considering whether it was necessary or in the students' best interest to call the police for a mere drawing;

   b. permitting both school staff and HPD to interrogate N.B. without Ms. Taylor or counsel present;

   c. keeping Ms. Taylor from talking, counseling, and assisting N.B. on the day of the incident at school;

   d. failing to explain to HPD that N.B. was disabled; and

   e. failing to account for N.B.'s disability throughout the entire incident.

127.   All of these actions increased the likelihood that N.B. would be falsely arrested.

128.   Defendant Runge and other DOE-HI Defendants acted knowingly, willfully, with malicious intent, with gross negligence, and in reckless disregard for Plaintiffs' rights.

129.   As a proximate cause of such negligence, Plaintiffs suffered and/or continue to suffer emotional suffering, physical and psychological injury, and trauma. Plaintiffs continue to experience fear, distrust, and anxiety regarding law enforcement officers and attending school.

130.   Plaintiffs are entitled to injunctive relief, declaratory relief, compensatory damages, punitive damages, and reasonable attorneys' fees and costs because of such negligence.

## SEVENTH CAUSE OF ACTION
### Negligent Training and Supervision
### (Against the City and County of Honolulu)

131.   Plaintiffs hereby incorporate all of the allegations contained in Paragraphs 1 through 77, above.

132.   The City owed a duty to Plaintiffs to adequately train and supervise HPD officers in how to interact with and whether and how to arrest and handcuff minor students and children, including children with disabilities, to prevent and avoid unnecessary injury to such students and children.

133.   The City failed to adequately train and supervise Defendants Neves, Perez, and Ford, and other HPD Defendants in how to interact with and whether and how to arrest and handcuff minor students and children, including children with disabilities, to avoid unnecessary injury to such students and children.

31

134.   As a proximate cause of such negligent failure, Plaintiffs suffered and continue to suffer emotional suffering, psychological and physical injuries, and trauma. Plaintiffs continue to experience fear, distrust, and anxiety regarding law enforcement officers and school.

135.   Plaintiffs are entitled to injunctive relief, declaratory relief, compensatory damages, punitive damages, and reasonable attorneys' fees and costs because of the City's negligence.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand a judgment for the following relief:

A.   Declaratory relief declaring that the actions and inactions described herein violated the rights of Plaintiff under the U.S. Constitution, Title II of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act;

B.   Injunctive relief requiring the City to expunge any and all criminal and/or arrest record of N.B. that resulted from Defendants' unconstitutional and illegal conduct and actions;

C.   For an award of compensatory damages for Plaintiffs' injuries, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary damages;

D.   For liquidated and punitive damages;

E.    For attorney's fees and costs of this suit, including expert witness fees and other litigation expenses, pursuant to 42 U.S.C. §§ 1988 and 12205; and

H.    For an award of such other and further relief as the Court deems just and proper.

        DATED: Honolulu, Hawai'i January 7, 2022


                        /s/ Mateo Caballero
                        MATEO CABALLERO
                        Caballero Law LLLC

                        Attorney for Plaintiffs
                        TAMARA TAYLOR, individually and on
                        behalf of her minor child, N.B.