CABALLERO LAW LLLC

MATEO CABALLERO                    10081
P.O. Box 235052
Honolulu, Hawaiʻi 96823
Telephone: (808) 600-4749
E-mail:   mateo@caballero.law

ACLU OF HAWAII FOUNDATION

JONGWOOK "WOOKIE" KIM     11020
P.O. Box 3410
Honolulu, Hawaiʻi 96801
Telephone: (808) 522-5905
E-mail:   wkim@acluhawaii.org

Attorneys for Plaintiffs
TAMARA TAYLOR, individually, and
on behalf of her minor child, N.B.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| TAMARA TAYLOR, individually and on behalf of her minor child, N.B., <br><br> Plaintiffs, <br><br> vs. <br><br> CITY AND COUNTY OF HONOLULU; HAWAII STATE DEPARTMENT OF EDUCATION; CHRISTINE NEVES, in an individual capacity; COREY PEREZ, in an individual capacity; WARREN FORD, in an individual capacity; TERRI RUNGE, in an individual capacity; HPD DEFENDANTS 1-10; and DOE-HI DEFENDANTS 1-10 <br><br> Defendants. | CIV. NO. 22-00013-HG-KJM <br><br> [CIVIL RIGHTS ACTION] <br><br> **PLAINTIFFS' STATEMENT OF POSITION CONCERNING DISCOVERY AND PUBLICATION OF DRAWING; DECLARATION OF N.B.; DECLARATION OF TAMARA TAYLOR; DECLARATION OF MATEO CABALLERO; EXHIBITS A-G; CERTIFICATE OF SERVICE** <br><br> Trial Date: September 6, 2023 <br> Judge: Hon. Helen Gillmor |

# **TABLE OF CONTENTS**

I.   BACKGROUND .................................................................................................. 6

II.  AUTHORSHIP, CONTROL, CUSTODY, AND PUBLICATION ARE STILL AT ISSUE. ................................................................................................ 12

   A.  Both Runge and the HPD Defendants knew that other children were involved, but did not seem to care. .................................................................. 14

   B.  N.B. did not have control over the drawing from lunch until the end of the day, when it was delivered. .......................................................................... 16

   C.  N.B. did not want the drawing delivered to E., much less to K. ................... 17

III. CONCLUSION ................................................................................................... 17

# **TABLE OF AUTHORITIES**

**Cases**

*In re PP*,
  133 Haw. 235, 325 P.3d 647 (Haw. Ct. App. 2014) ........................................... 13

*State v. Chung*,
  75 Haw. 398, 862 P.2d 1063 (Haw. 1993) ......................................................... 13

*United States v. Bagdasarian*, 6
  52 F.3d 1113 (9th Cir. 2011) .............................................................................. 13

*United States v. Lopez*,
  482 F.3d 1067 (9th Cir. 2007) ............................................................................ 12

**Statutes**

Haw. Rev. Stat. § 707-715 ..................................................................................... 12

## PLAINTIFFS' STATEMENT OF POSITION CONCERNING DISCOVERY AND PUBLICATION OF DRAWING

Pursuant to this Court's July 7, 2022, order [ECF No. 58] directing the parties to conduct further discovery to "clarify the issues surrounding the drawing including authorship and custody and control" and to "file Statements of their positions with respect to discovery and how it impacts publication" of the drawing at issue, Plaintiffs TAMARA TAYLOR, individually and on behalf of her minor child, N.B., hereby state that, based on the meager discovery provided by Defendants, the authorship, control, custody, and publication of the drawing continue to be at issue and in dispute, and it is therefore premature to file the drawing publicly as more discovery remains necessary.

The DOE Defendants[1] only produced eight pages of documents in response to Plaintiffs' extensive discovery requests.[2] The City Defendants[3] belatedly produced 236 pages of documents, 143 of which consist of Honolulu Police Department ("*HPD*") policies and procedures mostly available online. The City

---

[1] Defendants HAWAII STATE DEPARTMENT OF EDUCATION ("*DOE*") and TERRI RUNGE ("*Runge*") are collectively referred to as "*DOE Defendants*."

[2] Plaintiffs granted DOE Defendants an extension to respond to discovery requests unrelated to the drawing at issue until September 19, 2022.

[3] Defendants CITY AND COUNTY OF HONOLULU (the "*City*"), CHRISTINE NEVES ("*Neves*"), WARREN FORD ("*Ford*"), and COREY PEREZ ("*Perez,*" together with Neves and Ford, the "*HPD Defendants*") are collectively referred to as "*City Defendants*."

also admitted to destroying relevant documents after Plaintiffs filed a complaint with the Professional Standards Office alleging, among other things, that N.B. was falsely arrested.[4] The City Defendants and DOE Defendants also provided mostly unresponsive, self-serving, and incomplete answers to Plaintiffs' interrogatories, which at times contradict statements they made earlier about the incident.

In sum, the discovery responses so far raise more questions than they answer, particularly concerning the authorship, custody, control, and publication of the drawing, which, based on the responses so far, no one seems to have bothered to investigate before arresting N.B. Additionally, the Professional Standards Office investigation into the actions of the HPD Defendants was assigned to and conducted <u>by the same sergeant who was consulted and approved N.B.'s arrest</u>. *Compare* Ex. A at C000208 ("Sgt. M. CONJUGACION was appraised of the facts and circumstances and concurred.") *with* Ex. A at C000169 ("Sgt. Melvin CONJUGACION was assigned to investigate this case.").[5] This raises serious

---

[4] Even though Plaintiffs filed a complaint with HPD's Professional Standards Office on May 7, 2020, Ex. A at C000230-233, the City admitted to destroying other evidence related to the arrest, including the 911 call, the recordings of radio communications with dispatch, and the dispatch incident report, presumably pursuant to HPD's document retention policy. The City refused to provide such policy absent a separate document request. Ex. G at 1-3. Plaintiffs served such request on the City immediately. These facts raise a serious concern about spoliation of contemporaneous documents and evidence relevant to this case.

[5] Citation to page numbers in Exhibits A and B are to the Bates numbers in those documents. Citation to page numbers in Exhibits C, D, E, and F are to the page

concerns about the thoroughness and credibility of such an "investigation."[6] Thus, many questions remain about the drawing and N.B.'s arrest, and for the same reasons discussed at the July 7, 2022, hearing, additional discovery is necessary before the drawing is filed publicly.

## I.     BACKGROUND

On January 9, 2020, during lunch time at Honowai Elementary School, N.B. and three of her classmates made a drawing to get back at E., who had ruined N.B's earlier apology letter by pouring ranch dressing on it. SAC ¶¶ 35-41 [ECF No. 48]; Dec. of N.B. ¶¶ 2, 14. The apology and drawing stemmed from a run-of-the-mill school squabble, namely, N.B. telling on E. about passing notes to the boyfriend of one of N.B.'s friends. SAC ¶¶ 35-41; Dec. N.B. ¶ 14; Ex. A at C000206-207, C000211-212.

---

numbers in those interrogatory responses after the general objections. For ease of reference, Plaintiffs have added page numbers in brackets to the interrogatory responses attached as Exhibit F, because those pages were not numbered.

[6] Notably, HPD Policy 4.33 on "Handling Juveniles" states that "[t]he officer's supervisor shall be consulted and briefed on any facts and circumstances before an apprehension is made." HPD Policy 4.33, Part IV.E.2, https://www.honolulupd.org/wp-content/uploads/2020/01/HandlingJuveniles-05-06-2019-15-08-48.pdf. On January 10, 2020, Sgt. Conjugacion was the supervisor for Neves, Ford, and Perez. Ex. A at C000204.

The drawing, which N.B. never finished, was inspired by children's movies she had recently watched. Dec. N.B. ¶ 13.[7] While N.B. did most of the drawing, she did not color the drawing, did not write "F**kin," and did not write her name on the top. SAC ¶ 37; Dec. of N.B. ¶ 14. Her other classmates did this. They also made suggestions about the drawing and the writings on it. SAC ¶ 37; Ex. A at C000211; Ex. B at DOE-TAYLOR000007; Ex. C. at 3. Critically, N.B. also does not know who wrote "[N.]! You deserve dis!" in the back of the drawing or who addressed the drawing to K., a friend of E. and one of the complainants that resulted in N.B.'s arrest. Dec. of N.B. ¶ 14. N.B. only addressed the drawing to E., who did not file charges against N.B. Dec. of N.B. ¶ 15; Ex. A at C000206-207.

Ultimately, N.B. did not want to give the drawing to E., but one of her classmates, U., snatched the drawing from N.B. SAC ¶¶ 38-39; Dec. of N.B. ¶ 15. U. had the drawing from lunch until the end of the school day, when she gave it to E., who in turn showed it to K. Dec. of N.B. ¶ 15; Ex. A at C000206-207, C000212. They then brought it to the principal's office that same day.[8] At this

---

[7] This likely explains why Runge in her notes about the incident wrote: "[N.B.] seemed to take it lightly and began to talk about all sort of things that were not related to the situation at hand." Ex. B at DOE-TAYLOR000007. Runge took this talk as a sign that the ten-year-old, who admitted to making the drawing with others, was not "being responsible." *Id.*

[8] Runge claims that it was U., the carrier of the note, who had second thoughts and took it from E. and K., and brought it to her attention. Ex. C at 3. Based on the police report, K. and K.' mother told the police at the time that it was K. and E.

7

point, no one from Honowai Elementary School called the police or any of the parents named in the drawing. Ex. B at DOE-TAYLOR000007-08; Ex. C at 2-3. In other words, <u>no one perceived the drawing as a serious threat to campus or any other students requiring immediate attention</u>.

The next morning, N.B. was called to the Vice Principal's office, where Runge angrily confronted N.B. about the drawing, explaining that K.'s mom wanted to call the cops because of the drawing. Dec. of N.B. ¶¶ 2-3. Naturally, N.B. was both confused and scared. *Id*. ¶ 3.

Without looking at the drawing closely, N.B. told Runge that she made the drawing but also explained that other students were involved, but Runge seemed uninterested in that.[9] *Id*. ¶ 4. N.B. did tell Runge that one of the kids involved took

---

who brought the drawing to the school's attention. Ex. A at C000207, C000212. Notably, while Runge now claims that she personally met with U., who stated that she took back the drawing and turned in the drawing to the school, Ex. C at 3, it is unclear whether that meeting happened prior to N.B.'s arrest. Ex. B at DOE-TAYLOR000007 ("I found out *later* that [REDACTED] brought the note in to the office to give to Mrs. Ikeda, who was out, so a clerk gave it to Mrs. Kanea who gave it to me." (emphasis added)).

[9] While admitting that N.B. told her that other students were involved, Runge claims for the first time in her response to interrogatories that N.B. "declined" to tell on her classmates. *Compare* Ex. A at C000211 *and* Ex. B at DOE-TAYLOR000007 *with* Ex. C at 3. Notably, Runge does not mention asking the person who delivered the note whether other kids were involved and who they were. Ex. C at 3.

the drawing to deliver it to E. *Id.* ¶ 5. N.B. also told Runge that she did not want the drawing delivered but could not stop that classmate from doing so.[10] *Id.*

Even though they deny it in their interrogatories, the police also interrogated N.B.[11] Dec. of N.B. ¶ 6. Perez asked N.B. if she knew why the police were there and several officers repeatedly asked her if she had slapped E., which she did not. Dec. of N.B. ¶ 6; Ex. A at C000201.

N.B. was arrested, not because of the drawing, but because the police officers thought she was taking the situation as a joke. SAC ¶¶ 55, 118.d; Ex. A at C000200-201. She made some comments about jail to defuse the situation, but it had the opposite effect. Dec. of N.B. ¶ 7. When she was being arrested, Perez said to Neves: "Oh, so she wanted to see what jail was like for a day." Dec. of N.B. ¶ 9. During the Professional Standards Office investigation, every single officer recalled statements to this effect, suggesting their purpose with arresting N.B. was

---

[10] Runge does not mention this in her interrogatory response. Ex. C at 2-3. However, in her account of what happened, Runge states that "[N.B.] could not explain why she then gave it to [U.] afterschool to give it to [K.] and [E.]" Ex B at DOE-TAYLOR-TR000001.

[11] *Compare* Ex. D at 2 (Neves: "I did not interrogate her", Ex. E at 2 (Perez: "I did not participate in . . . interrogating . . . her."), and Ex. F at [2] (Ford: "I merely commented on what appeared to be jokes.") *with* Ex. A at C000200 (Ford: "I met with the student who appeared to be taking the incident lightly, including raising her hands in the air when Officers walked into the office to speak with her."); C000201-202 (Perez: "I asked if she knew why we, the Police, were there . . . . At no time during this incident did I question [N.B.] *while she was alone*." (emphasis added)).

not to handle a true threat, but to teach her a lesson.[12] Around that time, he also handed the handcuffs to Neves, who put them on N.B. using the last lock on the handcuffs. Ex. A at 14. The handcuffs were tight around N.B.'s wrists, they hurt N.B., and left marks when removed at the police station.[13] Dec. of N.B. ¶ 10. During all this time, Ford admitted to purposefully keeping Ms. Taylor away from her disabled daughter. Ex. A at C000200 ("I informed TAYLOR that I cannot allow her to speak with her daughter, as the Officers are conducting an investigation of the case.").

Significantly, the HPD Defendants and Runge did not seem to think that N.B. should have been arrested, nor did they treat the supposed threat that seriously. In this respect, Runge's notes about the incident state that the "officers and [Runge] took turns [sort of] to try to talk [K.'s mom] out of arrest mode and at least get her to discuss having a meeting with the other mom etc. All to no avail." Ex. B at DOE-TAYLOR000008; Ex. C at 3 (Runge: "To be very clear, I did not

---

[12] Ex. A at C000199 (Neves: N.B. "asked why she couldn't stay in jail."), C000200 (Ford: N.B. "appeared to be taking the incident lightly, including raising her hands in the air when Officers walked into the office to speak with her."), C000201 (Perez: "While entering the room, [N.B.] started to raise her hands in the air and say 'hands up, don't shoot!' She was smiling and appeared to be taking this incident very lightly.")

[13] In her responses to interrogatories, Neves also claims that N.B. "was able to slip [the handcuffs] off," Ex. D at 14, which N.B. denies. Dec. of N.B. ¶ 10.

10

request that the Honolulu Police Department arrest N.B. on January 10, 2020, and I am not the individual that sought criminal charged against N.B.").

After the arrest, Ms. Taylor met with Runge and Honowai Elementary School Principal Kent Matsumura on two occasions, on January 13 and 16, 2020. Dec. of Taylor ¶ 2. Ms. Taylor kept contemporaneous notes of these meetings. *Id*. During the first meeting, Ms. Taylor told them that other children were involved in making the drawing and they said that they were unaware of that information. *Id*. ¶ 4. Contrary to Runge's response to interrogatories, they did not ask Ms. Taylor and she did not refuse to give them the names of the other kids involved. *Compare id. with* Ex. C at 3.

At the second meeting, Ms. Taylor saw the drawing for the first time and reiterated to Runge that three other children were involved in making the drawing. Dec. of Taylor ¶ 5. Contrary to Runge's response to interrogatories, Ms. Taylor also told Runge the names of the other children who were involved and their respective involvement. *Compare id. with* Ex. C at 3. Runge responded that she felt it was best to not go further with an investigation "to not interfere with the courts" and that she had never had a problem with the other students involved. Dec. of Taylor ¶¶ 6-7. When Principal Matsumura later joined them, Ms. Taylor also explained to him that she had just learned that the parent who wanted to press

11

charges was the parent of K., not the parent of E., whom the drawing was for. Dec. of Taylor ¶ 8.

## II. AUTHORSHIP, CONTROL, CUSTODY, AND PUBLICATION ARE STILL AT ISSUE.

The day N.B. was arrested, neither Runge nor any of the HPD officers asked N.B. what the drawing meant or how it was made. As a scared ten-year-old child with disabilities, N.B. had trouble communicating with them by herself. Indeed, Ford admitted to purposefully keeping Ms. Taylor away from her daughter that day. Ex. A at C000200. There was simply no attempt by anyone to understand her purpose for making the drawing, which—given the context—was clearly not intended as a threat and was part of a run-of-the-mill school squabble. According to Neves, the entirety of her investigation consisted of talking to Runge, K., and K.'s mom, **none of whom had any personal knowledge about the drawing**. Ex. D at 5. This is significant because under clearly established law at the time, terroristic threatening was (and is) a specific intent crime for which, to arrest N.B., the HPD officers needed probable cause[14] that (1) a "true threat" had been made[15]

---

[14] *United States v. Lopez*, 482 F.3d 1067, 1073 (9th Cir. 2007) ("[W]hen specific intent is a required element of the offense, the arresting officer must have probable cause for that element in order to reasonably believe that a crime has occurred."); *see also* Haw. Rev. Stat. § 707-715 (requiring intent to terrorize or reckless disregard of the risk of terrorizing).

[15] Courts in Hawaiʻi have interpreted the terroristic threatening statute to require a "true threat" in order to withstand First Amendment scrutiny. *State v. Chung*, 75

12

and (2) N.B. either intended to terrorize another person or was reckless in disregarding such risk, which requires awareness of such risk.[16] Here, nothing indicates that N.B. intended the drawing as a true threat or was aware of such risk. To the contrary, the ranch dressing and passing notes incident, N.B. making light of the situation, and the actions of Runge and the HPD Defendants trying to talk K.'s mom "out of arrest mode," all indicate the opposite.

Relatedly, even though the police spent as much as an hour and a half at the school[17] and there were clear indications that other children were involved, Runge

---

Haw. 398, 416–17, 862 P.2d 1063, 1073 (Haw. 1993). A true threat under Hawaiʻi law is one that "on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." *Chung,* 75 Haw. at 416–17; *see also United States v. Bagdasarian*, 652 F.3d 1113, 1116 (9th Cir. 2011) ("[U]nder the First Amendment the State can punish threatening expression, but only if the 'speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.'" (citations omitted)).

[16] *In re PP*, 133 Haw. 235, 245-6, 325 P.3d 647, 657-58 (Haw. Ct. App. 2014) (holding that threats, including death threats, by 16-year-old adolescent to youth shelter counselor did not constitute "true threats" and that adolescent did not have the requisite culpable state of mind under terroristic threatening statute, because, among other things, nothing in the record indicated that "he was aware that his words or conduct created a risk that [another person] would be terrorized.").

[17] This is according to the police report, which states that HPD arrived shortly after 9:35 a.m. and left by around 10:55 a.m. However, Runge's notes state that N.B. was arrested closer to 11:45 a.m., which would indicate that the officers spent over two hours in the school. Ex. B at DOE-TAYLOR000008. The destroyed dispatch incident report would resolve this discrepancy. *See supra* n. 4.

and the HPD Defendants also seemed largely unconcerned about the authorship, custody, control, and publication of the drawing and were more preoccupied about a ten-year-old taking the situation lightly and as a joke. The police report indicates that N.B. was arrested based on statements from Runge, K., and K.'s mother, who personally knew little about these issues, and describes at length how the drawing was part of a non-violent squabble involving the passing of notes between children. Ex. A at C000205-208. Runge, on the other hand, completely omits such context from her recent statement. Ex. C at 2-3. Similarly, even though N.B. was questioned by the police, none of her statements appear in the police report. *See supra* n. 11. These are significant omissions and contradictions which—together with indications of spoliation and conflicted internal investigations—deserve additional discovery before a decision is made about filing the drawing publicly.

A.  **Both Runge and the HPD Defendants knew that other children were involved, but did not seem to care.**

Concerning authorship, N.B. readily admitted to Runge that she made the drawing, but N.B. also told the vice principal that other children were involved. Dec. of N.B. ¶ 4. From Runge's account at the time, it is clear that Runge did not believe N.B. Ex. B at DOE-TAYLOR000008 (stating N.B. "tried to blame others".). Runge also does not claim that she asked U., the carrier of the note, <u>who was not suspended or arrested</u>, about other children's involvement. *Id*.

14

Similarly, Neves knew that other children were involved from her interviews and written statements by Runge and K.'s mother, Ex. A at C000206-207, C000211-212, yet she did not seem to have followed up on those leads either, including by questioning U., who actually delivered the supposed threat. Only Perez at one point claimed to have asked N.B. questions about the drawing, though he now denies it. *Compare* Ex. E at 5 (Perez: "I did not investigate the drawing that led to her arrest.") *with* Ex. A at C000201-202 (Perez: "I asked if she knew why we, the Police, were there. She replied 'because of my letter?'").

Additionally, the drawing itself clearly shows different handwritings using different writing instruments and colors.[18] For example, it is clear from the spacing and cramming of the letters that K.'s name was not originally on the note and was made with a different writing instrument later. ECF No. 52 Ex. A (drawing submitted for review in camera). Similarly, the top of the drawing includes N.B.'s name, written upside down with what appears to be a marker and in cursive, unlike

---

[18] The copy of the drawing submitted to the Court by the City is a set of low quality photographs taken by Neves when she prepared the police report. *Compare* ECF No. 52 Ex. A *with* Ex. A at C000210. This copy was also not properly authenticated by someone with personal knowledge. ECF No. 52-2 ¶ 4. Plaintiffs asked the City to produce a higher-quality scanned version, but the City declined, offering instead that counsel from Plaintiffs go to HPD to take pictures of the drawing instead. Counsel for Plaintiffs are in the process of scheduling a time to do so and will submit such copy of the drawing to the Court in support of this statement for in camera review.

other writing on the drawing. *Id*. Finally, no one questioned the words in the back of the drawing stating "[N.B.]! You deserve dis!"[19] which indicated that other children wanted N.B. to get in trouble for it. These obvious alterations and additions all corroborated N.B.'s statements about the involvement of other children, but these indications too were ignored as the drawing was attributed to N.B. in its entirety without any serious investigation into other children.

### B. N.B. did not have control over the drawing from lunch until the end of the day, when it was delivered.

Concerning control and custody, N.B. lost control of the drawing at lunch when U. took it from her to deliver to E. Dec. of N.B. ¶¶ 5, 15. While Runge stated to the police that the drawing was made at 2:15 p.m., it is unclear where she received that information and that timeline seems unlikely in light of K.'s mom stating she picked up K. from school around 2:20 p.m. *Compare* Ex. A at C000211 *with* Ex. A at C000212. Even though they were specifically asked, Defendants did not provide any other information or documents concerning control and custody of the drawing. There is also contradictory information about whether it was U. or instead K. and E. who turned over the drawing to the school. *See supra* n. 8. Ultimately, it seems likely that alterations were made to the drawing after it left

---

[19] Notably, the word "this" is spelled correctly in the front of the drawing.

N.B.'s hands. Yet neither Runge nor the HPD Defendants allowed N.B. a meaningful opportunity to review and explain the drawing.

### C. N.B. did not want the drawing delivered to E., much less to K.

Concerning publication, N.B. has consistently maintained that she did not want the drawing delivered. She explained as much to Runge at the time, who took this as N.B. being "unable to explain why she gave it to [U.] afterschool to give to [E.] and [K.]." Ex. B at DOE-TAYLOR000008. In her response to interrogatories, Runge now states that "N.B. acknowledged that she asked [U.] to deliver the Drawing to [K.] and [E.]," Ex. C at 3, which N.B. denies. Critically, Runge did not write that in her report at the time and did not write that in her statement to the police. *Compare* Ex. C at 3 *with* Ex. A at C000211 and Ex. B at DOE-TAYLOR000008. The only other evidence are hearsay statements from U. to Runge. *See* Ex. B at DOE-TAYLOR000007. Based on the foregoing, additional discovery is also necessary on the issue of delivery of the drawing.

### III. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this the Court deny City Defendants' Motion to File Drawing Publicly Pursuant to Local Rule 5.2(d), or at least defer a decision until additional discovery is conducted in this case.

DATED: Honolulu, Hawaii, September 2, 2022.

                                              /s/ Mateo Caballero
                                              MATEO CABALLERO
                                              Attorney for Plaintiffs
                                              TAMARA TAYLOR, individually
                                              and on behalf of her minor child, N.B.